# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| SALLY REAVES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:18-cv-1230-B |
| | § | |
| U.S. SMALL BUSINESS | § | |
| ADMINISTRATION and JOVITA | § | |
| CARRANZA, *in her capacity as the* | § | |
| *Administrator of the U.S. Small Business* | § | |
| *Administration,* | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Sally Reaves's Motion for Summary Judgment (Doc. 68) and

Defendants Jovita Carranza and U.S. Small Business Administration (collectively, "SBA")'s Motion

for Summary Judgment (Doc. 66). These motions arise from the SBA's decision to garnish Reaves's

wages. For the reasons that follow, the Court affirms the SBA's garnishment decision in all respects.

Accordingly, the Court **GRANTS** the SBA's motion and **DENIES** Reaves's motion.

## I.

## BACKGROUND[1]

### A.    *Factual Background*

This case arises from Reaves's objection to the SBA's garnishment of her wages. Reaves

---

[1] The Court draws the facts from the parties' pleadings, the administrative record (Doc. 24-1), and the supplemental administrative record (Doc. 54). In its citations to the administrative records, the Court uses the "PageID" pagination generated by the Court's filing system.

owned a company called Sagebrush Solutions, LLC. Doc. 58, Third Am. Compl., ¶¶ 10, 12; Doc. 60, Answer, ¶¶ 10, 12. On November 29, 2006, Sagebrush entered into two separate loan agreements with PlainsCapital Bank (PCB). Doc. 58, Third Am. Compl., ¶¶ 10, 11; Doc. 60, Answer, ¶¶ 10, 11. Under the first agreement, Sagebrush received a one-million-dollar line of credit (LOC), which was guaranteed by the SBA (the "SBA Loan"). Doc. 58, Third Am. Compl., ¶ 10; Doc. 60, Answer, ¶ 10. Under the second agreement, Sagebrush received a $525,000 loan from PCB, but the SBA did not guarantee this loan (the "2006 Conventional Loan"). Doc. 58, Third Am. Compl., ¶ 11; Doc. 60, Answer, ¶ 11.

Reaves and her business partner pledged their personal securities accounts to personally guarantee both the SBA Loan and the 2006 Conventional Loan. Doc. 58, Third Am. Compl., ¶ 12; Doc. 60, Answer, ¶ 12. To memorialize her guaranty of the SBA Loan, Reaves signed an agreement with PCB on November 29, 2006 (the "Guaranty Agreement"). *See generally* Doc. 24-1, A.R., 125–30. The same day, she also signed an agreement with PCB for the SBA Loan (the "Security Agreement") in which she agreed to "secure [her] guarantee with a second lien security interest" in her personal securities accounts "subject only to a prior security interest" in the accounts "in favor of [PCB] securing [Reaves's] guarantee" of the 2006 Conventional Loan. Doc. 54, Suppl. A.R., 637.

In April 2012, Sagebrush entered into a thirteenth modification of the SBA Loan with PCB. *Id.* at 607–11. This modification required Sagebrush to pay down the SBA Loan balance by $221,064.89, resulting in a balance of $750,000 on the SBA Loan; eliminated available credit for draws; and required Sagebrush to make monthly payments of $10,513. *Id.* at 508.

In relation to this modification, PCB twice corresponded with the SBA. *See* Doc. 24-1, A.R., 123, 194–96. In the later correspondence, PCB requested that as part of the restructure, the "SBA

allow all of [Reaves's personal securities] to be pledged" behind two other loans by PCB, *see id.* at 123, neither of which were guaranteed by the SBA. Doc. 58, Third Am. Compl., ¶ 13; Doc. 60, Answer, ¶ 13. The SBA approved this request. *See* Doc. 24-1, A.R., 123. The Court will refer to this approval as "the subordination."

PCB's first loan, which would maintain a first-lien position on the securities accounts under the SBA-approved proposal, *see id.*, was a March 6, 2012, term loan totaling $171,126.68 ("$171,127 Loan"). Doc. 69, Pl.'s Br., 4; Doc. 67, Defs.' Br., 7. The other was an April 11, 2012, "revolving credit loan" for $250,000 ("$250,000 LOC"). Doc. 69, Pl.'s Br., 4; *see also* Doc. 67, Defs.' Br., 7. The parties agree that Reaves pledged her personal securities accounts to guarantee the $250,000 LOC. Doc. 69, Pl.'s Br., 4; Doc. 67, Defs.' Br. 7. But Reaves asserts that she did not pledge her personal securities accounts to guarantee the $171,127 Loan, *see* Doc. 69, Pl.'s Br., 4, although the subordination request from PCB to the SBA states that PCB has a "[first-]lien loan of $171,127" on the "marketable mutual funds." Doc. 24-1, A.R., 123.[2]

On August 14, 2015, PCB allegedly sent Sagebrush a demand letter indicating that the $171,127 Loan and $250,000 LOC were due. Doc. 58, Third Am. Compl., ¶ 23. By this point, Sagebrush had also defaulted on the SBA Loan. *See id.*; Doc. 67, Defs.' Br., 8. On September 10, 2015, PCB liquidated Reaves's personal securities accounts, which valued $217,125.75, as well as the personal securities accounts of Reaves's business partner, which valued $286,762.90. Doc. 58,

---

[2] Because the Court found no basis for supplementing the administrative record, *see* Doc. 65, Mem. Op. & Order, 9–10, the record lacks any other evidence of the collateral pledged to guarantee the $171,127 Loan. Doc. 80, Pl.'s Reply, 2; Doc. 54, Suppl. A.R., 505 ("Ms. Reaves does not provide documentary evidence as to the terms of either the 2011 or 2012 loan. As these loans are outside the SBA loan program, [the] SBA is without evidence of these loans.").

Third Am. Compl., ¶ 22; Doc. 60, Answer, ¶ 22. With these proceeds, PCB paid itself $97,221.78

on the $171,127 Loan, followed by $252,205.99 on the $250,000 LOC. Doc. 58, Third Am. Compl.,

¶ 24; Doc. 60, Answer, ¶ 24. Then, PCB applied $150,392.87 of the proceeds to the SBA Loan. Doc.

58, Third Am. Compl., ¶ 24; Doc. 60, Answer, ¶ 24. Thereafter, Sagebrush still owed $343,462.61

on the SBA Loan. Doc. 58, Third Am. Compl., ¶ 24; Doc. 60, Answer, ¶ 24. On January 15, 2016,

PCB requested that the SBA honor its guaranty on the SBA Loan. Doc. 54, Suppl. A.R., 516

(citation omitted). The SBA did so on March 28, 2016. *Id.* (citation omitted).

Given the outstanding balance on the SBA Loan and Reaves's personal guaranty of the loan,

in March 2018, the SBA issued an administrative wage garnishment order for payments made to

Reaves. Doc. 24-1, A.R., 192. Reaves then filed a request for a hearing and disputed the debt. *See*

*id.* at 222–26. After reviewing Reaves's objections, a hearing officer concluded that garnishment was

proper, *id.* at 120, and Reaves then sought judicial review of this decision with the Court.

B.      *Procedural Background*

Reaves initially filed suit against the SBA on May 14, 2018, seeking the Court's review of the

SBA's March 2018 decision to garnish her wages. Doc. 1, Compl., ¶ 5. After amending her complaint

twice, *see* Doc. 5, First Am. Compl., Doc. 32, Second Am. Compl., Reaves moved to remand the

case to the SBA. Doc. 43, Pl.'s Mot. to Remand, 1. Reaves asserted that in its March 2018 decision,

the SBA failed to consider several of her arguments. *See id.* at 8, 10. The Court agreed and remanded

the case to the SBA, directing the SBA to consider these arguments. *See* Doc. 53, Mem. Op. &

Order, 11–13.

On February 11, 2020, the SBA filed a supplemental administrative record containing its

additional findings, dated February 5, 2020, pursuant to the Court's remand order. *See* Doc. 54,

Suppl. A.R., 495. Thereafter, Reaves filed her third amended complaint, which objects to several findings from the SBA's March 2018 and February 2020 decisions. *See generally* Doc. 58, Third Am. Compl. One month later, Reaves filed a motion to supplement the administrative record with additional evidence or remand the case to the SBA. *See* Doc. 61, Pl.'s Mot., 1. The Court denied this motion, explaining that Reaves failed to show how the extra-record evidence fell into a recognized exception to the "record rule" or why remand was warranted.  Doc. 65, Mem. Op. & Order, 9–11.

Subsequently, Reaves and the SBA filed cross-motions for summary judgment. *See* Doc. 66, Defs.' Mot.; Doc. 68, Pl.'s Mot. Because the Court has received all briefing on these motions, they are now ripe for review.

## II.

## LEGAL STANDARD

A. *Summary Judgment in Judicial Review of Agency Action*

The Administrative Procedure Act (APA) "provides a way for persons . . . 'adversely affected . . . by agency action . . .' to obtain judicial review of that action." *Id.* (quoting 5 U.S.C. § 702). Section 706 of the APA establishes the scope of judicial review, which "has the function of determining whether the administrative action is consistent with the law . . . ." *See Girling Health Care, Inc. v. Shalala*, 85 F.3d 211, 215 (5th Cir. 1996) (citation and quotation marks omitted). Thus, the summary-judgment standard for APA claims is not whether there is a genuine dispute of material fact, but whether the agency action violated § 706. *See, e.g., Tex. Comm. on Nat. Res. v. Van Winkle*, 197 F. Supp. 2d 586, 596 (N.D. Tex. 2002) (analyzing whether the agency action violated § 706(2)(A)); *City of Shoreacres v. Waterworth*, 332 F. Supp. 2d 992, 1004–05 (S.D. Tex. 2004) (same).

Section 706 of the APA directs courts to set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" § 706(2)(A). "Arbitrary and capricious review asks whether the agency articulated a rational connection between the facts found and the decision made." *Worldcall Interconnect, Inc. v. FCC*, 907 F.3d 810, 817 (5th Cir. 2018) (citation and quotation marks omitted). The arbitrary-and-capricious standard thus requires the Court to ensure that the agency's factual findings are "supported by 'substantial evidence.'" *Id.* at 817–18 (citing § 706(2)(E)); *see also Desa Grp., Inc. v. SBA*, 190 F. Supp. 3d 61, 68 (D.D.C. 2016) (citation omitted) (equating arbitrary-and-capricious review with substantial-evidence review where "the arbitrary and capricious standard is performing that function of assuring factual support"). Substantial evidence is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Worldcall*, 907 F.3d at 818 (citation omitted). "In reviewing an agency's decision under the arbitrary and capricious standard, there is a presumption that the agency's decision is valid, and the plaintiff has the burden to overcome that presumption by showing that the decision was erroneous." *Tex. Clinical Labs Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010) (citation omitted).

In contrast to findings of facts, which are subject to the arbitrary-and-capricious standard, an agency's legal conclusions are subject to an "effectively *de novo*" review. *Tex. Tech Physicians Assocs. v. U.S. Dep't of Health & Hum. Servs.*, 917 F.3d 837, 844 (5th Cir. 2019) (citation omitted).

## III.

## ANALYSIS[3]

The overall dispute between the parties is the propriety of the garnishment of Reaves's wages. In an effort to demonstrate that the garnishment was improper, Reaves attacks many of the SBA's findings with respect to the subordination of the SBA's interest in Reaves's personal securities accounts. *See* Doc. 69, Pl.'s Br., 9–18. The Court first examines whether each of these findings is "arbitrary, capricious, an abuse of discretion, . . . not in accordance with law," or "unsupported by substantial evidence . . . ." § 706(2)(A), (E).[4] Thereafter, the Court turns to Reaves's alternative argument that because "neither PCB nor the SBA liquidated . . . Sagebrush's trade and contingent receivables," the Court should set aside the garnishment decision. *See* Doc. 69, Pl.'s Br., 19. Finally, the Court addresses Reaves's request for the Court to reconsider its denial of her motion to supplement the administrative record.

A.      *The SBA Did Not Err in the Factual Determinations Attacked by Reaves.*

In her motion, Reaves asserts that the SBA "should not have consented" to the subordination of its lien position and that "PCB should have applied the proceeds from the liquidation of [Reaves's] personal securities accounts to the SBA-guaranteed LOC first . . . ." Doc. 69, Pl.'s Br., 10. In support, Reaves points out several agency findings that are, according to Reaves, "arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, without observance of the procedure required by law, or unsupported by substantial evidence." *Id.* at 9. Below, the Court examines each

---

[3] Because the parties' cross-motions present the same issues, the Court addresses them together.

[4] As explained above, these inquiries are synonymous when the Court reviews whether an agency had factual support for its findings. *See supra* at Section II.A.

finding in turn and concludes that Reaves has not demonstrated error with respect to any of the findings.

1.  The SBA did not err in finding that the Guaranty Agreement allowed the SBA to subordinate its lien position.

Reaves first attacks the SBA's finding that the Guaranty Agreement permitted the SBA to subordinate its lien position on the SBA Loan. *Id.* at 10 (citing Doc. 24-1, A.R., 119). Instead, Reaves argues, the Guaranty Agreement "allowed only PCB to subordinate its lien position." *Id.* In response, the SBA points out that PCB—with the SBA's permission—subordinated the SBA's lien position as permitted by the Guaranty Agreement. Doc. 72, Defs.' Resp., 12.

The Court agrees with the SBA and upholds this finding. The relevant provision of the Guaranty Agreement provides that PCB "may . . . allow . . . subordination . . . of . . . security or collateral, without notice to or consent by [Reaves] . . . ." Doc. 24-1, A.R., 127; *see id.* at 125, 130. Pursuant to this authority, PCB sought the SBA's approval to pledge Reaves's securities in a lien behind both (1) PCB's $171,127 Loan, and (2) PCB's $250,000 LOC. *Id.* at 123. Given that the plain language of the Guaranty Agreement permits PCB to subordinate liens on Reaves's securities accounts, and PCB received the SBA's approval to do so, the Court finds no basis for disturbing the SBA's finding that the Guaranty Agreement permitted the subordination.

2.  The SBA did not err in its original decision by concluding that it was not harmed by the subordination.

Next, Reaves disputes the SBA's finding in its March 2018 decision that it "was not harmed by the subordination." Doc. 69, Pl.'s Br., 10 (citing Doc. 24-1, A.R., 119). According to Reaves, "the SBA was harmed . . . because the subordination put the SBA in an unsecured position since the collateral at the time of liquidation was not sufficient to pay PCB on the non-SBA guaranteed

indebtedness first and then pay the LOC in full." *Id.* Absent the subordination, Reaves explains, "the SBA would have been paid in full from the liquidation of [her] investment securities." *Id.*

The SBA's conclusion that it was not harmed by the subordination was rational, so the Court will not set it aside. As the SBA points out, the subordination "benefitted the SBA by reducing the SBA-guaranteed line of credit by $221,064.89, reduc[ing] the loan exposure risk, and converting the SBA loan from a line of credit to a fixed loan requiring principal and interest payment[s] . . . ." Doc. 72, Defs.' Resp., 13 (citing Doc. 54, Suppl. A.R., 509). Additionally, the hearing officer explained that had the SBA rejected the subordination, "the restructure would have failed" and "the investment securities would then have been applied to the SBA [Loan] in second lien position against a larger balance." Doc. 54, Suppl. A.R., 510. In light of these findings, the Court holds that the SBA's conclusion that it was not harmed by the subordination is not arbitrary or capricious.

And in any event, as the SBA points out, "this attack has no consequence on whether the subordination was proper . . . ." Doc. 79, Defs.' Reply, 3. Indeed, Reaves fails to explain how any harm to the SBA—or lack thereof—affects the propriety of the subordination or the resulting garnishment. *See* Doc. 69, Pl.'s Br., 10–11; *see also* Doc. 58, Third Am. Compl., ¶ 35. Reaves thus has not demonstrated prejudicial error with respect to this finding. *See* § 706 ("[D]ue account shall be taken of the rule of prejudicial error.").

   3.   The SBA did not err in relying upon the assumption that the 2006 Conventional Loan was not paid off prior to the subordination.

Reaves also objects to several findings in the SBA's remand decision that, according to Reaves, "were all based on the assumption . . . that the 2006 Conventional Loan . . . had not been paid in full at the time of the 2012 subordination." Doc. 69, Pl.'s Br., 11. These findings include:

(1) that UCC filings from 2011 and 2012 relate to the 2006 Conventional Loan; (2) that the SBA held a third-lien position on Reaves's securities accounts as a result of the subordination; and (3) the SBA's lien position before and after the subordination. *Id.* at 11–12.

According to Reaves, because "there is not substantial evidence that the 2006 Conventional Loan . . . had not been paid in full at the time of the subordination," there is not substantial evidence "that the SBA still held a second lien in [Reaves's] personal securities accounts at that time." *Id.* at 12. Based on this reasoning, Reaves urges the Court to set aside the SBA's findings, listed above, which assume the SBA had a second lien in Reaves's securities accounts before the subordination. *Id.* Though the objected-to findings are related, the Court analyzes the each one in turn below.

> a.   *The SBA's finding that UCC filings from 2011 and 2012 relate to the 2006 Conventional Loan is not arbitrary or capricious.*

Reaves first objects to the SBA's finding that UCC filings from 2011 and 2012 pertain to the 2006 Conventional Loan. *Id.* at 11. Specifically, on remand, the hearing officer analyzed UCC filings that substantiated the second-lien position of the SBA Loan in 2006. *See* Doc. 54, Suppl. A.R., 505–06. In this analysis, the hearing officer explained that the UCC filing relating to the SBA Loan "bears a higher number indicating it was filed" after the 2006 Conventional Loan. *Id.* at 506. Further, the hearing officer found that UCC filings from 2011 and 2012 relate to the 2006 Conventional Loan because they "are identified as relating to" it. *Id.* The 2011 filing contains "optional filer reference data" that states "(Conventional Loan - 2011)." Doc. 24-1, A.R., 235. Likewise, the 2012 filing bears a notation of "(Conventional Loan - 2012)." *Id.* at 234.

Though the Court cannot determine the accuracy of the hearing officer's conclusion that these filings pertain to the 2006 Conventional Loan, it nonetheless upholds this finding. The

referenced conventional loans—"(Conventional Loan - 2011)" and "(Conventional Loan - 2012)"—could be distinct from the 2006 Conventional Loan. But the Court need not make such a determination, because its review is limited to whether there is "evidence as a reasonable mind might accept as adequate to support [the hearing officer's] conclusion." *Worldcall*, 907 F.3d at 818 (quoting *Elgin Nursing & Rehab. Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 718 F.3d 488, 495 (5th Cir. 2013)). And here, the hearing officer's conclusion that the filings relate to the 2006 Conventional Loan is reasonable in light of the notations on the UCC filings. Further, in the decision, the hearing officer noted that Reaves did "not provide documentary evidence as to the terms of either the 2011 or 2012 loan," and that the "SBA is without evidence of these loans." Doc. 54, Suppl. A.R., 505. Given these circumstances, the Court cannot conclude that the SBA's linking of the 2011 and 2012 UCC filings with the 2006 Conventional Loan was arbitrary or capricious.

> b.     *The SBA properly concluded that the subordination left the SBA in a third-lien position.*

Reaves next objects to the SBA's finding that it was in a third-lien position following the subordination. Doc. 69, Pl.'s Br., 11.

This finding is supported by substantial evidence. Namely, the hearing officer relied upon the subordination agreement between PCB and the SBA in charting the effect of the subordination. *See* Doc. 54, Suppl. A.R., 507 (citing Doc. 24-1, A.R., 123). This agreement was a letter from PCB that was subsequently approved by the SBA. *See* Doc. 24-1, A.R., 123. In the letter, PCB asked that the SBA "allow all of the marketable securities to be pledged to the proposed $750,000 term loan be pledged instead (in a 2nd lien *behind the 1st lien loan described above*) to the $250,000 conventional revolving line of credit." Doc. 24-1, A.R., 123 (emphasis added). The "1st lien loan described above"

was the $171,127 Loan. *Id.* Given that the SBA agreed to subordinate its interest in Reaves's securities to that of PCB's interest arising from (1) the $171,127 Loan, and (2) $250,000 LOC, the conclusion that the SBA assumed a third-lien position upon subordination is not arbitrary or capricious.

> c.    *The SBA did not err in concluding on remand that it held a second-lien position before the subordination and a third-lien position thereafter.*

Reaves objects to the SBA's finding that the subordination resulted in the SBA Loan moving from a second-lien position to a third-lien position. Doc. 69, Pl.'s Br., 11–12.

The Court finds no basis for setting aside this finding. To the extent Reaves objects to the hearing officer's finding that the SBA held a third-lien position post-subordination, the Court has already addressed this finding as supported by substantial evidence. *See supra* at Section III.A.3.b. And insofar as Reaves argues that the hearing officer lacked evidence to conclude that the SBA had a second-lien position *before* the subordination, the Court disagrees.

As the hearing officer pointed out, Reaves's 2006 Security Agreement explicitly states that she agreed to secure her SBA Loan "with a second lien security interest" in her personal securities, "subject only to a prior security interest" in the 2006 Conventional Loan. Doc. 54, Suppl., A.R., 505 (referring to *id.* at 637–38). Further, the hearing officer noted that the Security Agreement governed "any and all renewals and extensions" of Reaves's debt. *Id.* In light of this Security Agreement and PCB's representation to the SBA that it maintained a first-lien position prior to the subordination, *see* Doc. 24-1, A.R., 123, the hearing officer reasonably concluded that the SBA maintained a second-lien interest leading up to the subordination. Though Reaves suggests that the 2006 Conventional Loan was paid off prior to the subordination, Reaves has not pointed to any evidence

in the record in support. *See* Doc. 69, Pl.'s Br., 12. Thus, the hearing officer reasonably concluded that the SBA held a second-lien position before the subordination, and this finding should not be set aside.

> 4.   The SBA did not err in concluding on remand that it was not harmed by the subordination.

Reaves asks the Court to set aside the SBA's February 2020 finding that the SBA was not harmed by the subordination. Doc. 69, Pl.'s Br., 10–11, 12–13. In explaining why this finding should be set aside, Reaves repeats arguments already made: absent subordination, the SBA could have been "paid in full or nearly paid in full," and "there is no evidence . . . that the SBA was still in a second lien position" leading up to the subordination. *Id.* at 13.

But the Court rejects these already-addressed arguments. As to the former argument that the SBA could have received full payment and thus was harmed, the Court has already held that the hearing officer's conclusion that the SBA was not harmed was neither arbitrary nor capricious. *See supra* at Section III.A.2. And as for the latter argument regarding the SBA's pre-subordination lien position, the Court has explained that the hearing officer could reasonably conclude that the SBA held a second-lien position leading up to the subordination. *See supra* at Section III.A.3.c. Accordingly, for the reasons already stated, the Court holds that the SBA's February 2020 finding regarding harm was supported by substantial evidence.

> 5.   The SBA's finding that PCB acted ethically was not arbitrary or capricious.

In her motion, Reaves asserts that the SBA lacked "substantial evidence" to find that PCB acted ethically. *See* Doc. 69, Pl.'s Br., 14 (citing Doc. 54, Suppl. A.R., 511–12).

Reaves has not met her burden of demonstrating that this finding is arbitrary or capricious.

In explaining this finding, the hearing officer stated that Reaves failed to submit any "allegations or evidence of unethical acts or omissions by [PCB]. . . ." Doc. 54, Suppl. A.R., 511. And Reaves has not pointed to any argument in the record suggesting unethical conduct.

Rather, Reaves now suggests that PCB's statement to the SBA that the $171,127 Loan had a first-lien position prior to the subordination lacks support in the record. *See* Doc. 69, Pl.'s Br., 14. In essence, Reaves argues that the hearing officer lacked substantial evidence to conclude that PCB "appears to have acted ethically," Doc. 54, Suppl. A.R., 511, because there is not evidence in the record verifying the accuracy of PCB's statement to the SBA. But such an argument does not demonstrate how, based on the record, it was unreasonable for the hearing officer to conclude that PCB appears to have acted ethically. Given the lack of allegations of unethical behavior by PCB, Reaves has not met her burden of showing that the hearing officer's conclusion was unreasonable.

Additionally, Reaves asserts that PCB acted unethically by failing to collect on Sagebrush's accounts receivable. Doc. 69, Pl.'s Br., 14–15. But as the SBA points out, this allegation of unethical conduct was not before the hearing officer. Doc. 72, Defs.' Resp., 15–16. Nor has the Court found any evidence in the record suggesting unethical conduct by PCB. Accordingly, the hearing officer's conclusion that PCB appears to have acted ethically was not arbitrary or capricious.

> 6. The Court will not set aside the SBA's finding that the subordination was in Sagebrush and the SBA's best interest.

In addition to objecting to the finding that the SBA was not harmed by the subordination, Reaves objects to the finding that the subordination was "in the best interest of [Sagebrush and the SBA] by allowing investment collateral to move to third lien position[.]" Doc. 69, Pl.'s Br., 15 (quoting Doc. 54, Suppl. A.R., 511). Reaves first re-urges her position that "the findings about lien

position should be set aside . . . ." *Id.* But as the Court has already explained, the SBA had substantial evidence for its conclusion regarding the SBA's lien position. *See supra* at Section III.A.3.b–c.

Second, Reaves argues that the subordination was not in her best interest. Doc. 69, Pl.'s Br., 15. As a preliminary matter, Reaves characterizes the hearing officer's decision as a finding that the subordination was in *Reaves's* best interest. *See id.* But the hearing officer was not considering Reaves's interests—she was considering those of "the borrower," Sagebrush. *See* Doc. 54, Suppl. A.R., 503, 511. Thus, the Court reviews whether the hearing officer's finding that the SBA acted in Sagebrush's best interest is arbitrary or capricious.

Upon review, the Court concludes that this finding was not arbitrary or capricious. In finding that the subordination was in Sagebrush's best interest, the hearing officer explained that PCB first attempted to secure a new line of credit for Sagebrush through a first lien on Sagebrush's accounts receivable. *Id.* at 511. "Only after that proved impossible . . . did [PCB] suggest collateralizing the new line with a second interest on the collateral securing the guaranty." *Id.* Under these circumstances, the hearing officer found that PCB "demonstrated a flexibility and problem solving that allowed a line of credit [to] be approved for Sagebrush to continue to use." *Id.* at 511–12. Rather than facing liquidation of its collateral, Sagebrush "was able to continue to operate for several years" after the subordination. *Id.* at 512.

The Court finds this analysis reasonable. "Perhaps a different factfinder could have reached a different conclusion, focusing on different evidence[,]" . . . [b]ut that does not mean the SBA's conclusion was arbitrary." *Ardmore Consulting Grp. v. Contreras-Sweet*, 118 F. Supp. 3d 388, 395 (D.D.C. 2015) (citing *Morall v. D.E.A.*, 412 F.3d 165, 176 (D.C. Cir. 2005)). Thus, the Court declines to set aside this finding.

7.    The Court will not set aside the SBA's finding that the subordination complied with the SBA's Standard Operating Procedure 50 10 4.

Reaves objects to the finding that the subordination complied with Standard Operating Procedure (SOP) 50 10 4, which "allowed the SBA several options other than subordinating the SBA's security interest in the personal securities accounts . . . ." Doc. 69, Pl.'s Br., 15–16 (quoting Doc. 54, Suppl. A.R., 512). But Reaves does not explain how the SBA failed to comply with this SOP. *See id.* And in the SBA's decision on remand, the hearing officer explained that the SBA complied with SOP 50 10 4 by "terming out" the outstanding balance of the SBA Loan. Doc. 54, Suppl. A.R., 512 (citing SOP 50 10 4, § 14(j)). The Court sees no basis for concluding this finding is arbitrary or capricious.

8.    The SBA's conclusion that it complied with SOP 50 50 4 is not arbitrary or capricious.

Reaves next contests the conclusion that the subordination complied with SOP 50 50 4, which permits subordination of a lien held by the SBA "to a lender that will provide new money to the borrower in order to improve [the] borrower's cash flow." Doc. 69, Pl.'s Br., 16–17 (quoting Doc. 54, Suppl. A.R., 512). The hearing officer found that the SBA complied with this provision "by having SBA's lien on the [guarantor's] collateral be subordinated in exchange for the new money lent by [PCB] which was used to partially pay down the [SBA Loan] and provide future working capital to Sagebrush." Doc. 54, Suppl. A.R., 512.

In disputing this finding, Reaves first argues that there is insufficient evidence that the money PCB lent to Sagebrush was used to pay off the SBA Loan. Doc. 69, Pl.'s Br., 17. The SBA, however, contends that "[i]t was the new money that authorized a subordination [under SOP 50 50 4], not the use of the new money." Doc. 72, Defs.' Resp., 16. Put differently, the SBA argues that the use

of the new money is immaterial to the hearing officer's conclusion that the SBA complied with SOP 50 50 4.

The Court agrees with the SBA. As the hearing officer noted, the subordination allowed Sagebrush to obtain a $250,000 LOC. *See* Doc. 54, Suppl. A.R., 512; Doc. 24-1, A.R., 123 (providing evidence of the $250,000 LOC). This appears to satisfy SOP 50 50 4, which does not mention the use of new money. Thus, Reaves has not demonstrated how the hearing officer's finding regarding the use of the $250,000 LOC is of any consequence. As a result, Reaves has not met her burden of demonstrating error in the SBA's finding that the subordination satisfied SOP 50 50 4. Further, to the extent Reaves disputes the hearing officer's statement that Sagebrush used the money lent by PCB to pay down the SBA Loan, she has not shown prejudice based on this finding. *See* § 706; *City of Arlington v. F.C.C.*, 668 F.3d 229, 243 (5th Cir. 2012) (citations omitted).

In her response and reply briefs, Reaves shifts grounds to argue that for the subordination to comport with SOP 50 50 4, PCB's provision of the $250,000 LOC must improve Sagebrush's cash flow. Doc, 73, Pl.'s Resp., 3; Doc. 80, Pl.'s Reply, 3–4. Due to the terms of the subordination, Reaves claims, Sagebrush's cash flow did not improve. Doc. 80, Pl.'s Reply, 3–4.

The Court rejects this argument, too. Given that PCB provided Reaves with the $250,000 LOC as part of the subordination, the Court sees no error in the hearing officer's conclusion that the subordination comported with SOP 50 50 4. SOP 50 50 4 does not appear to require the SBA to analyze every condition surrounding the lender's provision of new money and determine the net effect of these conditions—rather, the SOP states only that an SBA lien on collateral may be subordinated "to a lender that will provide new money to improve borrower's cash flow." SOP 50 50 4, Ch. 7, Question 5, § h(1)(a). PCB provided the $250,000 LOC to Sagebrush, and the hearing

officer could reasonably conclude that this new money improved Sagebrush's cash flow.

In sum, Reaves has not demonstrated that the SBA erred by finding that the subordination complied with SOP 50 50 4, nor has Reaves shown any prejudice based on the finding that Sagebrush used the money lent by PCB to pay down the SBA Loan. Consequently, the Court will not set aside the finding that the subordination complied with SOP 50 50 4.

9. <u>The Court upholds the SBA's finding that the loans at issue were not in a piggyback structure.</u>

Reaves objects to the hearing officer's finding that neither the original structuring of the loans nor the subordination "result[ed] in a piggyback structure." Doc. 69, Pl.'s Br., 17–18 (citing Doc. 54, Suppl. A.R., 513–14). SOP 50 10 5(D) prohibits lenders from creating a piggyback structure, which "occurs when one or more lenders provide more than one loan to a single borrower at or about the same time, financing the same or similar purpose, and where the SBA-guaranteed loan is secured with a junior lien position . . . on the collateral securing the non-guaranteed loan(s)." SOP 50 10 5(D).[5]

The conclusion that the loans were not in a piggyback structure in 2006 is not arbitrary or capricious. As a preliminary matter, Reaves does not explain how the *original* structuring resulted in improper piggybacking; rather, she states "that the piggy back structure is [the] 13th Modification of the LOC to the $250,000 Loan." Doc. 69, Pl.'s Br., 18. But even assuming Reaves contests the original 2006 structuring, her argument fails. As the hearing officer explained, "the primary collateral required by the SBA authorization was a 1st position security interest in contracts . . . ." Doc. 54,

---

[5] The relevant SOP at the time of the initial structuring in 2006 contained the same provision. *See* Doc. 54, Suppl. A.R., 513 (citing SOP 50 10(4)(e)).

Suppl. A.R., 514. Indeed, although the 2006 Conventional Loan held a first-lien position on the securities accounts in 2006 and the SBA Loan held a second-lien position, the SBA still maintained a first-lien position on Sagebrush's contracts. *Id.* Accordingly, the SBA did not guarantee the SBA Loan "with a junior lien position," *see* SOP 50 10 5(D), and there was no piggyback structure in 2006.

Nor did the modification of the loans resulting from the subordination create a piggyback structure because, as the hearing officer explained on remand, "the new non-SBA line of credit was made at a different time than the [SBA Loan] . . . ." Doc. 54, Suppl. A.R., 514. Specifically, as Reaves recognizes, the $250,000 LOC originated in 2012. Doc. 69, Pl.'s Br., 5. Reaves also acknowledges that the SBA Loan was created in 2006, and that due to the 2012 modification, there was a "change to the terms of the [SBA Loan] . . . ." *Id.* at 3, 4 (emphasis added). Thus, the SBA Loan was not created in 2012 and was not provided "at or about the same time" as the $250,000 LOC. Accordingly, the Court agrees with the SBA that the subordination did not create a piggyback structure.

10.   The liquidation of Reaves's securities accounts complied with 31 U.S.C. § 3713.

Reaves contests the SBA's finding that the liquidation of her securities accounts complied with 31 U.S.C. § 3713. Doc. 69, Pl.'s Br., 18 (citing Doc. 54, Suppl. A.R., 515–17). Section 3713 provides that under certain circumstances, "[a] claim of the United States Government shall be paid first" among those of other creditors. Here, the parties dispute whether the SBA (and thus the Government) had a claim at the time of liquidation. *See* Doc. 69, Pl.'s Br., 19; Doc. 72, Defs.' Resp., 11–12. The hearing officer concluded that the SBA did not have a claim because, as explained in a treatise published by the Department of Treasury, "a debt arising from a guaranteed loan (like the

SBA 7(a) loan program) does not become a claim of the government until the government repurchases the loan or pays the loss claim." Doc. 54, Suppl. A.R., 515 (citation omitted). Because PCB requested that the SBA honor its loan guaranty on January 15, 2016, and the SBA "approved the purchase of the guaranty" on March 28, 2016, the hearing officer reasoned that "the SBA claim became choate on or about March 28, 2016." *Id.* at 516. Accordingly, the hearing officer concluded that the SBA did not have a claim under § 3713 at the time of liquidation. *Id.*

Reaves ask the Court to set aside this finding based on *United States v. Excellair, Inc.*, a 1986 case from the District of Colorado. *See* Doc. 69, Pl.'s Br., 19. In *Excellair*, the district court reasoned: "The sole sensible interpretation of [§ 3713] is that a loan guaranteed by the government is a 'claim of the United States' even when at the time of transfer, the guarantee had not yet been honored." 637 F. Supp. 1377, 1395 (D. Colo. 1986) (quoting § 3713(a)(1)). The SBA, on the other hand, contends that the hearing officer's finding that the SBA did not have a claim was sound. *See* Doc. 67, Defs.' Br., 21–22.

The Court concludes that the liquidation did not violate § 3713. Whether or not the SBA had a claim within the meaning of § 3713 is a question of law that is subject to review *de novo*. *See Tex. Tech*, 917 F.3d at 844 (citation omitted). A "claim" under § 3713 includes "any amount of funds or property that has been determined by an appropriate official of the Federal Government to be owed to the United States . . . ." 31 U.S.C. § 3701(b)(1).

There is no controlling authority addressing whether an agency-guaranteed debt on a loan is "owed" to the agency before the agency repurchases the loan. But numerous courts analyzing an agency–guarantor's right to a priority claim upon the debtor's filing of bankruptcy have concluded that to obtain priority, the agency–guarantor must have "actual legal title" of the debt prior to the

bankruptcy filing. *See United States v. Brocato*, 403 F.2d 105, 108–09 (5th Cir. 1968) (applying the predecessor–statute to § 3713); *Guillermety v. Sec'y of Educ.*, 241 F. Supp. 2d 727, 733–34 (E.D. Mich. 2002) (rejecting the plaintiffs' argument that under § 3713, "a debt can be a claim of the United States even if the debt is not yet owed to, or enforceable by, the United States" (internal quotation marks omitted)); *United States v. Schlesinger*, 88 F. Supp. 2d 431, 459 (D. Md. 2000) (concluding that the debtor did not become indebted to the United States under § 3713 until the defaulted note was assigned to a federal agency). This conclusion makes sense—a debt that is not yet assigned to the United States cannot be owed to the United States.

In the same vein, here, Reaves owed PCB—not the SBA—until the SBA, as guarantor, purchased the loan. Consequently, Reaves did not owe the SBA until its purchase of the loan on March 28, 2016. *See* Doc. 54, Suppl. A.R., 692 (approving guaranty purchase). Since the parties agree that liquidation of Reaves's securities accounts occurred prior to this date, *see* Doc. 58, Pl.'s Third Am. Compl., ¶ 22; Doc. 60, Defs.' Answer, ¶ 22, the SBA was not entitled to priority under § 3713 at the time of liquidation Accordingly, the Court agrees with the SBA that the United States did not have a priority claim under § 3713.

B.    *Reaves's Assertion that PCB and the SBA Failed to Liquidate Sagebrush's Trade Accounts Receivable Does Not Warrant Reversal.*

In the alternative, Reaves asks the Court to set aside the garnishment decision based on the failure of PCB and the SBA to liquidate "other collateral for the LOC, including Sagebrush's trade and contingent receivables . . . ." Doc. 69, Pl.'s Br., 19.[6] Reaves explains that the relevant SOPs

---

[6] The parties dispute whether Reaves can raise this argument so late in the proceedings. *See* Doc. 67, Defs.' Br., 22; Doc. 80, Pl.'s Reply, 5–6. The Court assumes without deciding that Reaves may raise the argument because, as discussed below, it does not warrant reversal of the SBA's decision.

required PCB or the SBA to liquidate Sagebrush's other collateral, including its trade accounts receivables, to satisfy the SBA Loan. Doc. 69, Pl.'s Br., 20–21. Because the record lacks substantial evidence that the SBA complied with these SOPs, Reaves argues, the Court should overturn the garnishment decision. *Id.* In support, Reaves points to a December 2015 email in which the Senior Vice President of PCB stated that the value of Sagebrush's accounts receivable, as of March 2015, was $249,851. *Id.* at 21 (citing Doc. 24-1, A.R., 190).[7]

With this evidence, however, Reaves falls short of meeting her burden to demonstrate error. In essence, Reaves asks the Court to infer—based on a single email—that because Sagebrush had $249,851 in accounts receivable in March 2015, it necessarily maintained this value until liquidation. *See id.* Reaves then suggests that crediting this inference, the Court should set aside the garnishment decision because the record lacks evidence "that any liquidation of the collateral for the [SBA Loan] occurred . . . ." *Id.* at 20. But a single email recounting Sagebrush's accounts receivable six months before liquidation does not overcome the "presumption that the [SBA's] decision is valid . . . ." *See Tex. Clinical Labs*, 612 F.3d at 775 (citation omitted). Nor does a lack of evidence of the liquidation of Sagebrush's accounts receivable doom the SBA's garnishment decision—as Reaves appears to concede, she never raised this argument at the agency level, so the hearing officer had no occasion to address it. *See* Doc. 80, Pl.'s Reply, 5–6. Reaves cannot argue that the SBA lacked substantial evidence for a conclusion that it never made.

In sum, Reaves has not met her burden of showing that PCB or the SBA should have liquidated Sagebrush's accounts receivable. Thus, the Court rejects Reaves's argument for reversal

---

[7] Reaves cited "PageID 90" of Document 24-1. Doc. 69, Pl.'s Br., 21. But there is not a PageID 90 in Document 24-1. Because PageID 190 appears to be the email Reaves describes, the Court assumes it is the page she intended to cite.

on this basis.

C.      *The Court Declines to Reconsider the Exclusion of Reaves's Extra-Record Evidence.*

In her reply brief, Reaves urges the Court to reconsider its decision denying her motion to supplement the administrative record. Doc. 80, Pl.'s Reply, 2 (citing Doc. 65, Mem. Op. & Order). In that decision, the Court explained that "Reaves fail[ed] to articulate how the specific evidence [offered fell] within an exception permitting supplementation of the administrative record." Doc. 65, Mem. Op. & Order, 8. Mere relevance, the Court reasoned, "does not justify the addition of extra-record evidence." *Id.* (citations omitted).

Reaves has not advanced any new argument with respect to supplementation of the administrative record. *See generally* Doc. 80, Pl.'s Reply. As a result, the Court will not reconsider its ruling.

## IV.

## CONCLUSION

For the foregoing reasons, the Court affirms the SBA's decision to garnish Reaves's wages. Accordingly, the Court **DENIES** Reaves's motion for summary judgment (Doc. 68) and **GRANTS** the SBA's motion for summary judgment (Doc. 66).


**SO ORDERED.**

**SIGNED: October 26, 2020**.


JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

- 23 -